**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| DAVID W. JACKSON, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>FEDERAL DEPOSIT INSURANCE )<br>CORPORATION, )<br>)<br>Defendant. ) | Case No. 05-CV-269-GKF-FHM |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter having come on for non-jury trial, the Court hereby enters the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

The first fifteen (15) findings are facts to which the parties have stipulated, as set forth in the final Pretrial Order [Document No. 103].

1. The FDIC is a U.S. Government corporation, established by Congress.

2. During 2001, the FDIC developed a Buyout program for reducing staff in its Legal Division. The Buyout program was approved by the FDIC Board of Directors in July 2001.

3. Employees retiring under the Buyout program received a payment equal to 50% of their annual salary, plus numerous benefits, including continued participation in the FDIC dental insurance program.

4. David W. Jackson ("Jackson") was an attorney in the FDIC's Dallas regional office. [Jackson was a resident of Broken Arrow, Oklahoma at the time he filed this action.]

5. In August 2001, the FDIC provided Legal Division attorneys eligible for voluntary retirement with a Buyout offer, set forth in a Voluntary Separation Payment Program handbook ("the Handbook"). The Handbook described dental insurance benefits as follows:

> Dental insurance continues for life for retired employees and their eligible dependents at no cost as long as the FDIC maintains such a benefit. However, the FDIC reserves the right to amend any aspect of the dental insurance program or to terminate the program.

6. The Summary Plan Description for the 2002 Dental Insurance program stated that:

> The FDIC may terminate the Plan or may modify, amend or change the provisions, terms and conditions of the Plan at any time.

The Summary Plan Description was published on the FDIC website in October, 2001. The plaintiff did not receive this document by mail until October, 2002.

7. On October 15, 2001, Jackson signed a "Statement of Intent to Retire with a Buyout."

8. In addition to the Buyout Handbook, in December 2001, Jackson received a memo from Larry Scanlon, as [sic] employee in the FDIC Dallas Regional Office, that included a statement that "Your dental coverage under the FDIC Dental Program will continue at no cost."

9. On January 14, 2002, Jackson again signed a "Statement of Intent to Retire with a Buyout."

10. On March 6, 2002, Jackson received a memo from Kathy Bibi, another employee in the Dallas Regional Office, summarizing the terms of his agreement to retire with a buyout. That memo included a statement that: "The retiree Standard Option Denal plan continues at no cost for as long as the FDIC shall provide the benefit."

11. Jackson retired under the Buyout program on March 9, 2002.

12. From his retirement in March 2002 until the end of 2003, Jackson paid nothing for standard option dental insurance for himself and his wife.

13. In 2004, the FDIC amended its dental insurance program. Under the amended program, all active employees and retirees who wished to participate in the program were required to pay a 15% share of the insurance premium. Effective January 1, 2007, this share was increased to 20%.

14. Only a narrow category of retirees – those who retired with buyouts in 1994, 1995, and 1996 – continued to receive dental insurance at no cost after 2004. For those years, the applicable Buyout Handbook, the contract governing their retirement benefits, stated that "Dental Insurance continues for life for retired employees and their eligible dependents at no cost."

15. In January 2004, the FDIC began charging Jackson approximately $3.20 per week for standard dental insurance coverage for himself and his wife.

16. Jackson has paid the dental insurance premiums for himself and his wife under protest since January 1, 2004.

17. The original mandatory separation date in the September 2001 Voluntary Separation Incentive Payment Program was December 31, 2001. The FDIC subsequently sought and obtained an extension of the buyout period from the Office of Personnel Managment to March 9, 2002. Jackson's first Statement of Intent to Retire with a Buyout of October 15, 2001 on December 29, 2001 was revoked, and Jackson's second Statement of Intent to Retire with a Buyout dated January 14, 2002 is the operative binding acceptance of the FDIC's buyout offer.

## CONCLUSIONS OF LAW

1. The court has subject matter jurisdiction over this controversy pursuant to 12 U.S.C.

§ 1819(b)(2)(A), as this is a suit of a civil nature at common law to which the FDIC is a party.

2.   Venue is proper in this forum pursuant to 28 U.S.C. § 1391, as the FDIC is a U.S. Government corporation with sufficient contacts in this federal district, and defendant was a resident of this district when he brought the action. The FDIC has not objected to venue in the Northern District of Oklahoma.

3.   The FDIC contends that the contract was to be performed by FDIC in Washington D.C. and that the law of the District of Columbia applies to this dispute. Jackson contends that the law of Texas applies, as he accepted the FDIC's offer in Dallas. A federal court adjudicating state law claims must apply the forum state's choice of law principles. *Dang v. Unum Life Insurance Co.*, 175 F.3d 1186, 1190 (10th Cir. 1999). Under Oklahoma law, "a contract is to be interpreted according to the law and usage of the place where it is to be performed, or if it does not indicate a place of performance, according to the law of the place it was made." *Id.*

In this case, the FDIC developed a buyout program offered to eligible permanent FDIC employees throughout the United States. The FDIC designated nine "Buyout Coordinators" in various offices across the country, including Atlanta, Boston, New York, Chicago, Dallas, Kansas City, Memphis, San Francisco, and Washington, D.C. Upon review of the documents admitted into evidence, the Court concludes that the various buyout contracts, including the one at issue herein, were to be performed in the District of Columbia. The contract law of the District of Columbia applies to this dispute.

4.   Jackson interprets the contract to include lifetime dental insurance at no cost, subject only to the FDIC's rights to *otherwise* amend the dental insurance program or to terminate the dental insurance program altogether. The FDIC argues that it is not bound to provide dental insurance at

no cost forever, because it explicitly reserved the right to amend "any aspect of the dental insurance program or to terminate the program," and that dental insurance continued at no cost for retirees and their eligible dependents as long as the FDIC maintained dental insurance at no cost for its active employees.

The first step in contract interpretation is determining what a reasonable person in the position of the parties would have thought the disputed language meant. *1010 Potomac Assoc. v. Grocery Manufacturers,* 485 A.2d 199, 205 (D.C. App. 1984). The meaning must be ascertained in light of all the circumstances surrounding the parties at the time the contract was made. *Id.* The writing must be interpreted as a whole, giving a reasonable, lawful, and effective meaning to all its terms. *Id., citing* RESTATEMENT (SECOND) OF CONTRACTS §§ 203(a) (1981) ("an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect"). If the document is facially unambiguous, its language should be relied upon as providing the best objective manifestation of the parties' intent. *1010 Potomac Assoc.,* 485 A.2d at 205. Extrinsic evidence of the parties' subjective intent may be resorted to only if the document is ambiguous. However, extrinsic evidence may be considered to determine the circumstances surrounding the making of the contract, so that it may be ascertained what a reasonable person in the position of the parties would have thought the words meant. *Id.*

5.  The court concludes it cannot interpret the Handbook in the manner urged by Jackson and give meaning to both sentences. Jackson's interpretation would limit the FDIC's explicit "right to amend any aspect of the dental insurance program" by denying it the right to amend the cost thereof. In addition, Jackson's interpretation would render the FDIC's explicit right "to

terminate the program" – set forth in the second sentence – superfluous. Under Jackson's interpretation, the first sentence already grants FDIC the right to terminate the dental insurance program altogether.

6.   There is no ambiguity in the Buyout Handbook description that tells eligible permanent FDIC employees both that the terms of the program continue at no cost as long as the FDIC maintains such a benefit and that the FDIC reserves the right to amend any aspect of (or terminate) the dental insurance program. In *Sprague v. General Motors Corp.*, 133 F.3d 388, 401 (6th Cir. 1998), the Sixth Circuit Court of Appeals, en banc, rejected a similar argument of a group of early GM retirees who sought a judgment seeking GM to furnish them with basic health care coverage at no cost for their lifetimes. The summary plan descriptions "unambiguously reserved GM's right to amend or terminate the plan," but also told the retirees that "their health coverage would be paid 'at no cost to' them and 'for [their] lifetime[s].'" *Id.* The Sixth Circuit stated "[w]e see no ambiguity in a summary plan description that tells participants both that the terms of the current plan entitle them to health insurance at no cost throughout retirement and that the terms of the current plan are subject to change.

> To read this summary as saying that the plan can never be changed in such a way as to mandate retiree contributions for continued medical coverage is to read into the summary something its authors did not put there (a promise to provide lifetime 'paid up' medical insurance), while reading out of the summary something that clearly was put there (an express reservation of right to change the plan)."

Id. (quoting *Musto v. American Gen. Corp.*, 861 F.2d 897, 906 (6th Cir. 1988)). Here, as in *Sprague* and *Musto*, the promise made to early retirees was a qualified one: the promise that dental insurance would continue at no cost for life provided the FDIC chose not to amend or terminate the dental insurance program.

7. The court concludes the Handbook language provides FDIC the right to amend the cost of dental insurance for employees who retired under the 2001 Voluntary Separation Payment Program because it no longer maintains no-cost dental insurance for active employees. The term "such a benefit" in the first sentence refers to the provision of dental insurance at no cost, which the FDIC provided as long as it provided no-cost dental insurance to its active employees.

8. Jackson also contends the FDIC is estopped from denying him dental insurance at no cost. It is well settled that the Government may not be estopped on the same terms as any other litigant. *Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. 51, 60 (1984). However heavy the burden might be when an estoppel is asserted against the Government, the private party cannot prevail without at least demonstrating that the traditional elements of an estoppel are present. *Id.* A party invoking the doctrine of estoppel must show, among other things, that the party relied upon a representation to his detriment. *Morris v. Buvermo Properties, Inc.*, 510 F. Supp. 2d 112, 117 (D.D.C. 2007); *Simard v. Resolution Trust Corp.,* 639 A.2d 540, 552 (D.C. 1994). At trial, Jackson admitted he "would have retired anyway" [without a no-cost dental insurance benefit]. The court concludes that the traditional elements of estoppel are not present in this case.

9. The court concludes that defendant FDIC is entitled to judgment in its favor on the claims of plaintiff Jackson. The judgment is entered contemporaneously herewith.

ENTERED this 18th day of February 2008.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma